Mr. Barnett? Yes, good morning, Your Honors. My name is Charles Barnett. I'm one of the attorneys for Mrs. Oak, the appellant. I will use 12 minutes of my time and reserve three minutes. This case impacts three important principles that we Americans cherish. Number one, freedom. Number two, no one is above the law. And number three, God-given, constitutional, inalienable rights. So let me tell you briefly the story of how the defendants here violated Mayor Oates' rights and how the trial court became an advocate for the defendants, resolving disputed issues, including issues of credibility, in favor of the defendants contrary to law and creating palpable injustice to Mrs. Oates. First of all, it was a July date. Let me interrupt because those are interesting questions and interesting things to discuss. But what we really ought to get to are the issues in this case. Yes. And the issues as they pertain to, first, the question of absolute immunity. Yes. That was granted. And even, you know, taking the facts aside, we will interplay them with the issues, but why don't you go directly to the issues in the case before us? We have only at this time, is it, how many defendants do we have before us now? We have defendant Holloman, Hammond, Chapman, and Wood. And so the trial court's dismissal of this case here relied upon what? Well, one, as to absolute immunity, she relied on the concept that a officer testifying before the grand jury has blanket absolute immunity. Where she erred is failing to understand that there is no absolute immunity for conduct taking place before or after. That is conduct that is administrative or investigative. No one is above the law in America. That may be qualified immunity, but it's not absolute immunity. And the facts here show. So to follow your point on that, essentially what you're saying is, yes, if the allegations rely upon testimony given at the grand jury or trial, but in grand jury, there's absolute immunity. But your point is there are allegations here that fall outside, and you don't need that testimony to make that allegation. What specific ones are you speaking to that do not lie upon the grand jury testimony? Yes. In this. What is that? Those facts include the fact that Miss Chapman, defendant Chapman concealed from the district attorney along with the other defendants. Excuse me a minute. Judge Harris, are you frozen in place? I was looking and you weren't moving, so I didn't know if you'd left us or not. Am I back? I can hear everything. Can you guys hear me? Okay. Okay. I just interrupted because I saw that you all of a sudden froze and I didn't know. Okay. All right. Yes. Yes. Defendant Chapman conduct before and after the grand jury concealed from the district attorney. The fact that there was one and economic development committee, the Chapman had defendant Chapman had evidence. She had interviewed witnesses. She had documents of the economic development committee and the plan. But she repeatedly told the district attorney Montaigne that there was no such thing as an economic development committee. And therefore, all of the expenditures that had been allocated for the economic development committee were fraudulent. And without any kind of receipts supporting those expenditures, she knew that was false. She let's deal with you. You got to you got to conspiracies. One conceal one fabricate. It appears to me that all of the fabrication information at least comes from that grand witness grand jury testimony. I mean, what what did show me an allegation that shows something outside of that grand jury testimony on fabrication? Exactly. For example, Long, Mr. Defendant Long gave Miss Chapman files showing the travel expenses. Now, this these travel expenses were in Chapman's possession. The defendants, including Chapman, never provided those expenses to the D.A. and never provided to us who were representing Mayor Oates in the criminal case. So instead, she went and testified, presumably that there was no such expense. But more importantly, there were two key issues here. One, the economic development committee and whether those expenses that that committee existed and whether their expenditures were legitimate. And two, whether there were any receipts verifying the business purpose of those various expenditures. Chapman knew that because she had frequent meetings in L.G.C.'s office where the files were within eyesight of Edmund and Solomon and and Hammond. And they knew they were literally trying to create a case and then hide the evidence to to convict an innocent person. And we know so. So what did she fabricate? Well, what she fabricated that there was no economic development committee. That was a fabrication. It was a lie. And it was a fabrication because she had hard evidence from a witness named Andrews who gave a declaration. She had evidence from even Long who gave evidence of the economic development committee. She had evidence from original Smith who had traveled to D.C. to meet with the Obama administration to try to bring economic development to this this Princeville historic town. So it's rather than giving the defense the defense attorneys who were defending that evidence. And rather than giving it to the district attorney, she kept that evidence and fabricated the idea that there was no supporting evidence and that the economic committee didn't exist. And therefore the DA brought the charges. Yes. I'm sorry to interrupt. Can I just ask you a question about the record? The district court said that it was undisputed that Chapman had turned over her investigative files, which included a lot of conflicting evidence of the sort you're describing. Some people thought there was an economic development committee. Some people thought there wasn't. And the district court said it is undisputed that she turned over those investigative files to the prosecutors. She emailed it to one of them and the other one was cc'd or something like that. Did you, in fact, dispute that? Was the district court wrong about that being undisputed? The court is absolutely wrong. And if you look in the record at in record eight, eight, six through nine or one, you'll see repeated testimony from D.A. Montagne that Chapman repeatedly told her, we've given you all the documents. There's no more documents and there's no such thing as an economic development committee. I'm sorry. Those are those are sort of two different things. I do understand that it's alleged that after turning over those files, she said, I don't have anything else. And that's a separate point. But you don't dispute. Right. that the that the files were some portion of evidence suggesting that there was no economic development committee was, in fact, turned over to the prosecutors. I understand that you did. The evidence that should have been turned over was the file that they all concealed. That was the evidence of the Economic Development Committee, along with the files of the receipt. And we knew they had the receipts because they used the receipts from the PNC bank file for Mayor Oates to craft the indictment. So we knew they had those two files. And so that's why when Judge Smith ordered that we do a site inspection, ultimately, Edmond said, oh, well, there are two. There's some other files in my office. They were right in their desk within our site. She could reach and grab them. Those were the two key files. Yes. Can I get my only other question? What is the constitutional cause of action in this case? Is this a Fourth Amendment violation that you're alleging? It's a Fourth Amendment violation to deprivation of freedom. And it's also a 14th Amendment violation. I have questions about the 14th Amendment. But on the Fourth Amendment, is the seizure the part where where your client was ordered to surrender by Evans after the after she was indicted? Then she was ordered to surrender. And as I understand it, she went to the courthouse and was fingerprinted and released. Is that right? But that's the seizure. She was arrested by Chapman and had to be fingerprinted. So her liberty was restricted. Her freedom was at risk. She was facing 68 years in jail. No, I understand. So it sounds like I'm just reading from the district court's second order in this case that Evans instructed oaths through her attorney that she had to surrender at Superior Court. And there was an initial appearance in court and she was fingerprinted. Defendant had her fingerprinted and released. But but so that's the seizure. Right. That was the seizure. That's correct. OK. All right. I understood. And so my question is, it sounds at least from this as though it was the prosecutor, Evans, who ordered that she be brought to the courthouse for an arraignment. And so I am concerned, you know, we've held in some other cases that even if an investigative officer misleads a grand jury to get an indictment, if there's an intervening cause between that indictment and the actual seizure, because the prosecutor orders someone arrested or orders someone to surrender, that kind of breaks the causal chain for purposes of your Fourth Amendment claim about the seizure. And I was I just want to make sure I understood the record and see if I was wrong to be concerned about that. Well, you're not wrong to be concerned about it. But the conclusion is, is, is has to be analyzed here. There was no probable cause to arrest Mr. Boat at all. So everything that occurred thereafter was the fruit of the poison tree. And we know even with with Mr. Long, if we look at Mr. Long's testimony right up on March 27th, 2013, which was just two days before they released this state auditor's report, he testified he had no evidence that Ms. Oates had committed any crime. Likewise, Holloman testified, and this is in the record at 231. Holloman testified he had no evidence that Mrs. Oates had committed any embezzlement. There was no evidence. All Mrs. Oates wanted to do is have an accounting for the 26 million dollars FEMA money that no one had given in accounting for her little impoverished child. She went to LGC, the people who were in control of the finances, for help. The very second day after she complained on July 30, 2012, the very next day, they seized all the records. The temporal proximity of that action is pregnant with probative evidence itself. Why? Why were they investigating Mayor Oates instead of investigating her complaint of the missing 26 million dollars? And then you look at the credibility in this case, both the credibility for Chapman as well as the other defendants. Chapman testified again repeatedly that she knew nothing about the Economic Development Committee. That was false. That is what misled D.A. Mantagna, as she stated in deposition and in declaration. And then you look at Edmond and Holloman and Hammond. They claim that they knew nothing about this spreadsheet. Well, they used the spreadsheet from this file, the PNC bank file for Mayor Oates, to craft the indictment along with Chapman. But yet, once they had to turn over this file, they claim, oh, we didn't know anything about the spreadsheet. We didn't create it. And we never saw those files with the Economic Development Committee and with the receipts, with the business purpose written on the back of the receipt. Those lies are credible tribal issues for a jury. They impact whether or not the defendants indeed deliberately and intentionally fabricated evidence and whether defendants out of their 20 meetings, you count up the meetings, they had more than 20 meetings, whether they intentionally conspired to jail an innocent person. So once you create a crime, you hide the evidence that's in your office, in the case of Edmonds, within an arm's reach, then it's the fruit of the poison tree. You've got an innocent person. Everything that flows from that violates the Fourth Amendment and violates the liberties as well as the due process aspects of the 14th Amendment. And the trial judge got it wrong by saying there was no identifiable constitutional right that Chapman violated. This case is totally an injustice to me, and it should be reversed. In fact, plaintiff's summary judgment should be granted. But I don't want to use up my time. I want to finish now to have my say some time for rebuttal. Thank you. Thank you, Mr. Bonner. Mr. Bergerstein? Here, let me use my time to fill in some blanks here. The record in this case is huge, but I think it's very revealing to take a look at Joint Appendix 888 through 907, where Montagne testifies about various ways that she was misled by the defendants about the existence of the. Let me ask you a question regarding you have a 1983 claim in 1983 and itself doesn't exist in a vacuum. So your colleague has indicated there's a Fourth Amendment claim here. Is that Brady claim being asserted? Mr. Bonner says yes. So you're not going anywhere with that because you didn't go to trial on it. Brady claims are pretty much not allowed in that. I didn't mean to walk you into that, but I'm just trying to understand what your allegations are here. The trial judge granted absolute immunity because he says she says, well, these come out of the grand jury testimony. And if you look at the fabrication and go back to the allegations there, they nearly all reference the grand jury testimony. Recklessly failed to show the grand jury, for instance, in the First Amendment complaint or testified before the grand jury. There's no question that those arise from grand jury testimony. But I want you to focus on the concealment, which we didn't get to talk about. And the reason I bring that up is because you do have an allegation in which you said from July 2012 to the present, which seemed to indicate there's something outside the grand jury's testimony that would support the concealment charge. Let me talk about that. Montagne testified in deposition at length, page 888 to 907, that she had numerous meetings with the LGC representatives and Chapman as Montagne is preparing her case, that they misled her about the existence of the Economic Development Committee. She says this repeatedly that she relied on those representations and they knew they were relying on her. And Montagne's memo that she wrote when she decided to withdraw the charges is very revealing. And that's at page 2299 to 2306. And she talks about the sequence of events and how she was misled. And, for example, Edmondson and Holman told Montagne that the Economic Development Committee didn't exist. And LGC then tries to block the subpoena to review the records in their office, which Montagne never saw. And when Montagne finally saw the records on the eve of the criminal trial, she said she was, quote, shocked at the volume of documents that she had never seen before that were sitting in the LGC's offices all the while. I think there were thousands of records. That's page 3750 to 3751, how shocked she was at the volume of documents that were there. Why didn't they tell her this sooner? And she said as soon as she saw those documents, quote, there goes my case. And she said also that not only were there credibility issues about these belated documents, but there were, quote, severe evidentiary issues that led to her decision to abandon the case. That's page 2303. Now, in granting summary judgment, the district court at page 3738 talks about sort of alternative reasons why the defendants may not have produced these records in a timely way. But that really resolves issues of their intent. She says, well, the volume of documents in the LGC offices was overwhelming and the office was in disarray and disorganized and there was no inventory of documents. That may be true, but that's not the only reason a jury can find that these documents were not produced. And you assume these are governmental officials, they're professional, they know how to run an office, that there might be another reason they didn't produce these records besides, you know, managerial or office incompetence. That's really an issue for the jury. Councilman, may I ask you a question? You would agree that it's undisputed, as Mr. Bonner said, that there was a lot of evidence that the Economic Development Committee existed, correct? There's evidence, a lot of evidence. Correct. But would you also conclude that there was also evidence or testimony or statements that people said that it didn't exist? You agree with that? Sure. Those statements were made by some of the defendants, though. Yeah, but they're witnesses. They're witnesses, prosecutors. Don't forget, they're defendants in this case now, but at that point, they're witnesses. They're people who we investigate. My point is that I'm not asking you to concede that it was true, but there was evidence that other people said it didn't exist, correct? Correct. All right. So when we weigh in concealment for purposes of grand jury law, we look for probable cause. So let's assume that that was concealed. Don't we have to look at materiality, and that is whether or not if you remove all of those things, or if you add the – well, I guess I almost said this would be an add-on, right, rather than a takeaway. So I guess if you put all of those things in, would it still be probable cause to go forward with the one, the half that said it didn't exist? You see what I'm saying? Very seldom does a prosecutor put all defense evidence to the grand jury. I mean, almost never. So the question, though, is did they hide something or conceal something that would be material, which means that with it or without the concealment or the fraud, there wouldn't be probable cause. So my question to you is would it still be probable cause to go forward based on the half that said it didn't exist? That's my question. No, for a couple of reasons. Number one, as soon as Montagne saw the documents and saw what was in those boxes, she immediately realizes there's no case here. The people who told the prosecutor that the EDC didn't exist were the people who knew that the Economic Development Committee did exist. Those were the people who controlled the town's finances. They had all the town's records, and they're in their offices. They knew there was such a committee, and when they told Montagne that the committee didn't exist, the jury is allowed to find that they were intentionally concealing the truth. And if that's the case, then why can't a jury find that there was no probable cause? Because the problem is probable cause at this stage, that stage is for a legal determination by the court. Even if a prosecutor gets cold feet or for whatever reason, oh, I'm not prosecuting this case, that's not the end of the legal inquiry as to whether or not it's material as to does probable cause still exist. Well, I don't know if I would agree with that. A jury can decide that it wasn't simply that Montagne had cold feet. It was more like, my God, you didn't tell me what I need to know. There's clear evidence that the committee exists, and you have the evidence in your office, and you didn't tell me, and what's going on here? And it's not as if there was a stray witness who said, oh, I don't know if the EDC really exists. These were LGC people. They knew all about the town. They controlled the finances. What's going on here? These are classic issues of intent. Probable cause, I get it. There's a legal component to that. But ultimately, a jury can decide whether there was probable cause to cause somebody's arrest. But did you appeal it? I don't see you in your brief. You even argued that the prosecutors lacked probable cause to indict this plaintiff. Well, it was the foreseeable result of the defendant's concealment of these records. They knew that if they did. My question is, did you appeal it? Well, close to that, which is that the LGC people are being sued because they knew that their misrepresentation. You can't do it close to it. You have to appeal it. If the district court finds there's no probable cause, then that probable cause exists. You can't just come up here and start. I mean, it's an interesting argument, and I'd like to be a little bit more focused when we're dealing with legal issues here. There's a lot of stuff you could argue here. You could go on and on. But, you know, there's some central issues here, and I want to just tell you, if you don't deal directly with the issues, you may think you're advancing something, but what you're advancing is some nice things to say, but it's not going to resolve the case. And there's some very pointed issues in this case here, and among them exists. Well, first of all, you would start out and say, we've got a 1983 case, and this is where it arises, under these particular points. And then you would address the district court's holding, particularly with absolute immunity. You've got Brady claims. You've got all kinds of things here. There's a lot here that has to be parsed through, but when you get through it, you're only dealing with the law. I mean, the probable cause thing is an interesting argument, but you didn't even appeal it. It's not before us. This is a concealment case. They concealed evidence to the DA knowing that it was going to result in Mayor Oates' arrest. And the motive that you give is what? I think Mr. Bonner can address the motive. In other words, why did they do this? I mean, what was it here that there's an intent to do this sort of thing? She was speaking out about missing funds from the government that went to the town of Princeville, and once she speaks out, the LGC moves in and takes over the town's finances and then sets her up for an arrest through the concealment. So this is a conspiracy case withholding records that foreseeably results in her arrest when they knew there wasn't enough evidence to arrest. And you can have evidence of a tacit understanding. You don't need direct evidence of motive to conspire against the plaintiff, but that's the theory of this case. It's a conspiracy to withhold records that foreseeably results in the plaintiff's arrest and processing her in criminal court. Thank you. Thank you. Thank you. Mr. Rabinovitz? Thank you, Your Honors, and good morning. May it please the Court, I'm Brian Rabinovitz, Special Deputy Attorney General with the North Carolina Department of Justice. I'm arguing today on behalf of the defendants at police. And before I jump into my argument, I just wanted to clarify, Judge Wynn had asked about who are the remaining defendants in this case specifically. That would be Wood, Chapman, who was the SBI agent, and then the three individuals who were staffed to the local government commission. That's Holloman, Hammond, and Edmondson. And Mr. Bonner had referred to Defendant Long, and I just wanted to clarify that Mr. Long was dismissed out of the case, and the plaintiffs have not appealed his dismissal out of the case. So it's only the five defendants. So now, having done that, tell us the issues that are in the case. And are these all 1983 issues? Your Honor, those are the only issues that the plaintiffs have raised in the case. I want to make sure I understand. Is it only 1983 issues? Those are the only remaining issues in the case, yes, Your Honor. And what do you understand to be the basis upon which they make a 1983 claim here? In other words, what are you going to be arguing against? Because if you're going to go, whether it's Brady or whatever, I need to know what you're going to be arguing about, because we're all over the place on that, and you need to be more pointed. When you are trying to assert an action on a 1983, you need to be very pointed in terms of where does it come from, and what is the violation here? Yes, Your Honor. Because the trial judge made some specific findings here. Specific code and absolute immunity is one of them. So go ahead and let me hear that answer. Yes, Your Honor. What is the authority you're going to be arguing that they allege, that you think they allege? Yes, Your Honor, and I absolutely agree that some of the allegations have been all over the place here. I think you keyed in on the two issues. So absolute immunity, of course, is a central issue in this case. And then the stringent burden for proving a civil conspiracy under Section 1983 is the other issue in this case. What is the statutory authority for the 1983 claim that you are going to be arguing on? I got all of the gentlemen talking, but 1983 is not an action by itself. It comes from somewhere. Yes, Your Honor. A violation of some act. What are those? What is it? I mean, you just can't say Fourth Amendment. It has to be something within the Fourth Amendment. And you just can't say Brady. I mean, you got to give us something here. So what is it that you are going to – and I'm not putting it on you, but you're going to be arguing, so I want to know what you're going to be arguing. That's what I'm saying. Absolutely, Your Honor. As best I understand the claim, and I believe that Judge Harris's questions were right on point, the seizure is basically when Ms. Oates had to go and appear in court, do a first appearance in court, her fingerprints were taken, a bond was set, and she paid her bond. That, from what I understand, is the seizure. I also agree with what you suggested, Judge, when I do not see a fabrication. I don't see any evidence or any allegations, really, of fabrication of evidence here. I think that what we're talking about, I think their claim really is a concealment of evidence. Well, they have a fabrication, but the fabrication is from evidence that arises from the grand jury, which is why the judge in this case said it was absolute immunity. The question goes to the concealment because the allegations also say – it points to the 2012. That's not grand jury. So that's where you get into the concealment, from my view. Yes, Your Honor, that's absolutely right. Their fabrication claim is – Judge Harris has a question. I didn't really ask the question. I'm sorry because I do feel like we need to ask your colleagues more about this, too. You're not the one who brought the claims, but I really am struggling for someone in this case to tell me what is the cause of action, what's the claim. It looks like a malicious prosecution claim under the Fourth Amendment, but the district court said it can't be a malicious prosecution claim. I'm not sure that was right, but it hasn't been appealed. So what are we even talking about? What is the claim? What are the elements that you're going to argue are not here? Assuming we're under the Fourth Amendment – and you said in your brief it might also be a due process claim, but I don't see how that can possibly be true after the Supreme Court's decision in Manuel, which said no, until trial, it's the Fourth Amendment or nothing. And they specifically said that includes claims that a grand jury indictment was tainted by falsity. So let's assume it's the Fourth Amendment. What's the cause of action? It's the Fourth Amendment and what? Your Honor, I have to confess that I may be as puzzled as you. I've lived with this case for a long time, and I find it difficult to put my finger on what the specific claim is. They've said repeatedly, and really the only constitutional claim they've put forward is this Fourth Amendment claim based on what they say is concealment and fabrication of evidence. And what I would say in response is I believe on both of those issues, concealment and fabrication of evidence, those are only claims against Defendant Chapman. And I think that the Rayberg case rules the day here as the district court recognized, because I think that those claims are both tied to the grand jury testimony. As Judge Wynn said, I think that's absolutely clear with respect to the fabrication claim. I believe that it's also clear with respect to the concealment claim. And the reason is that the court in Rayberg set out what the scope of that absolute immunity is. And it is not just strictly what a grand jury witness says in front of the grand jury. It also goes to claims of conspiracy, which there obviously is here, and also to preparatory activity that occurs, especially between the grand jury witness and the prosecution. And so I would argue, first of all, that to the extent they have made a claim there, the absolute immunity from Rayberg, the scope of that is broad enough to cover all of the allegations that they've made with respect to Defendant Chapman. And the problem becomes for them, aside from their difficulties of, you know, articulating a clear claim in this case, the difficulty becomes that that is then dispositive on the conspiracy claim as well, because in order to have a Section 1983 conspiracy claim, that claim is that's not a freestanding claim. The law is clear on that. You have to have some underlying deprivation of constitutional right. And so if the claim against Chapman, the two claims against Chapman fall because Rayberg governs those claims, as we argue that it does, then the conspiracy claim against all of the defendants here also falls. Can I ask, Mr. Butler said that he said he raised also a 14th Amendment claim. I think that's what he said. Your Honor, I don't. My reading is that they have relied on the Fourth Amendment throughout Mr. Bonner. The record is is large here and there have been lots of brief files filed at different points in this claim. Perhaps I'm not going to doubt Mr. Bonner if he has somewhere in his argument where he has pointed to that. But I'm not I'm not acquainted with that. But I don't know that that would affect the grand jury immunity. Because you can't come back up. Maybe I've misheard Mr. Bonner, but I think he said 14. But but your answer is, as far as you know, none exists. That's that's correct. Your Honor. But now that you did, you did. Basically, this is about getting together. He alleges to undermine her life. That's one of the first things he said. The right to protection, protection on the law. And they got together and undermine her because she raised questions about other matters. And then, lo and behold, there's a temporal timing. This comes up. That's the theory of it. He's alleging they got together and say, well, we're going to do this. Liberty rights, liberty rights in terms to be free from being arrested, free from being, as he said, subject to many years of imprisonment based on their concealment. That's what he said. I believe it is serious. You're saying that that's not in the case. Or if it is in the case, it has no merit. I believe if I understand correctly, and I'm sorry, you're a little quiet, Judge Gregory. So so it's a little bit harder to hear you. But, you know, my understanding is that against all the defendants, yes, they've stated this conspiracy claim. So their claim is that all these defendants have conspired together to deprive, deprive Miss Everett Oates of her constitutional rights. And they have mentioned at least here today at argument, you know, several rights that they believe were deprived from her. I do not think that they've articulated an argument. And I don't see that in their brief based on anything other than this Fourth Amendment seizure claim. And if if your honor reads the the order from the district court, what the district court allowed them to proceed on specifically was against Chapman, the concealment and seizure fabrication and seizure. That's the way that those claims were characterized. So those are the only legal claims that they have remaining in these in this case, aside from this conspiracy claim and the conspiracy claims specifically that they articulate is that all these defendants conspired to make or to cause defendant Chapman to fabricate evidence before the grand jury or to conceal evidence from the grand jury. Those are my understanding of the technical claims that they have in this case. And your honor, I think I as I've argued and we argue in our brief. Perhaps you say it too narrowly. Conspired to undermine her liberty. Now, yes, one of the mechanisms as a chapman, they say is to the grand jury. But there's I think a legend that is broader than that. And they're saying this was sort of, as I understand it, they're alleging that this was kind of hatched. This idea was hatched that is we're going to do this to undermine her liberty rights. So, but that's the. All of this can't be funneled just to a grand jury. If that's the theory that the theory is that well grand jury or whatever, smear her in any way we can use. Otherwise, the conspiracy can be broader than that. Being an act in furtherance. Every act in furtherance doesn't narrow conspiracy necessarily you're saying that everything has to go through the tunnel of the grand jury for fourth amendment. Yes. But not for broader concept is seem to be arguing, they got together and hatched this plan to undermine her, her liberty, her freedom. I think Mr. Bonner said he said that she has a right to free exercise a right and enjoyment of peace and liberty and pursuit of happiness like any other American. That's how you frame it. And so I guess the question is, so you're saying that that doesn't exist, or if it does exist in the case has no merit. That's all I'm asking you. Yes, your honor. I'm saying my understanding of the claims that they put forward. If your honor reads the district court's order that limited the three claims that they were allowed to go forward on. And then their amended complaint, which is styled the first amended complaint, although it's actually, they had amended the complaint once before so it's it's it functionally it's the second amended complaint that they styled as the first amendment complaint. Your honor, I believe that what they are alleging there is that the conspiracy was to cause defendant Chapman to fabricate and conceal evidence. And so I think that those are the technical issues in the case. However, even if this court were to give a broader reading to their conspiracy claim, I think, first of all, they still need to allege what the underlying constitutional deprivation is. And I think they have a problem. If absolute immunity applies to both the fabrication and the concealment claims. And second of all, I'm sorry. Can I just I'm sorry, because I want to ask you about that the first time you said I just want to stop you there. So your position is a bit of a brain twister for me. Your position is that if Chapman is absolutely immune as to the concealment and fabrication charges, then that means that so are all the alleged co-conspirators, basically, because it's not if she's immune. We're not saying there wasn't a constitutional violation. We're saying sort of there's nothing actionable. There's no actionable constitutional violation. Maybe she lied to the grand jury. Maybe she didn't. We can't even get into that. But you think that that kind of a holding rather than the district court's alternative holding, there's no evidence of concealment or fabrication. But the immunity holding itself would be enough to take care of the conspiracy charge as well. There's no such thing as conspiring to do something for which Chapman was immune. Is your position. Yes, Your Honor, that that is our position. And I also think, again, because of the way that I technically understand their claims, I think that has to be the case, because I think the conspiracy claim is not just that there was some freestanding conspiracy. I understand it was a conspiracy. The district court said, here's what you can go forward on your claim that you conspired to make Chapman lie to the grand jury. That's your claim. And you think if Chapman's immune, so is everyone else. Effectively, if Chapman's immune, that's not an illegal conspiracy. Yes, because I think the I think there has to if the conspiracy claim is that they conspired to cause her to conceal or fabricate evidence and they cannot move forward on a claim that Chapman concealed or fabricated evidence. Yes, it's it's our position that then the conspiracy falls with it. However, I would like to briefly, if I may address in the last few minutes that I have some of the facts of this case, which I think are salient because it is a fact intensive case. And I think the most important thing that that you, Judge Harris, pointed out earlier is the issue of whether this entire FBI file was given over to the prosecutor in this case, because it is undisputed in the evidence that that entire file was given over to the prosecutor. Montaigne testifies to that. That goes to the to the claim of concealment, correct? Yes, Your Honor. That that goes to the claim. Your statement is simply that it wasn't concealed. It was given over. Exactly. That all of the information that was in there was given over. And that's that in the record at thirty seven, thirty seven specifically. And then it's also discussed farther. Thirty seven, thirty eight to thirty seven. Forty four. Those are from Montana. Is the concealment claim. See, we've been going around in circles. Is that a Brady claim being made here? Your Honor, they have not they have not articulated a Brady claim style faith is bad faith and element of the concealment claim. I think that I think the way that they have construed it, it would either be intentionally or with reckless disregard, I think, is the state of mind. I don't think that there's a specific bad faith state of mind, but intentionally, I guess, could be bad faith maliciously or reckless disregard. If I may, Your Honor, I think unless it's a Brady claim, then it's a Brady claim. It likely would have a bad faith. You're saying if it arises in some other vehicle concealment, Brady in of itself deals with the failure to disclose. So it needs to be concealed, which takes it a little further than maybe beyond Brady. But I'm trying to understand at least if that is a violation that they intentionally to conceal is one thing, but to do it, conceal it with a purpose of doing it. Concealing alone doesn't mean anything if all you did is conceal. If it didn't hurt you, if it was no purpose to it. But the allegation here is a purpose here. I don't quite understand yet why it is that they would, it's being alleged why it was being done other than maybe they just didn't like them. I don't know what it is. I mean, why would you conceal evidence in a case like this? Not that you, I don't understand that. That's the whole concealment aspect of it, the bad faith aspect of it, at least from the Brady or at least intentionally in the recklessness of it. Recklessness of it, I will say, you know, this what is this group called LG, LG, D or whatever it is that it goes down. It takes over Princeville's finances and then they fight to keep you, the defendants from going in and seeing what's the basis of it. Finally, you get in and I understand there's about 30,000 records all over the place in disarray, not found. No one knows anything. And I'm wondering, well, who's going to take over this entity? Because it looks like to me the entity itself needed someone to take it over. It's in disarray. No one knows what. And in the midst of that file, what the facts, if you want to talk facts, what makes it really egregious, it sounds like something is wrong in the midst of those files. You've been saying this former mayor is dealing with an economic development group that doesn't exist. And here it is, some evidence of it right here in those files. Then you say she didn't have receipts right in the midst of evidence. You find those some of the receipts, a lot of receipts there, which frustrates the prosecutor. I don't know whose bird it is, but you've got this agent who's supposed to be doing this job of finding this out. And you bring an allegation against a public official. She loses everything, including the election, the whole bit. And at the end of it, you said, well, we're going to dismiss the charges. And that's the end of it. Because the end of it for the government, but not for her. She's been destroyed with all of these allegations when all it took was to go look at what they actually had. What amazes me is they fought to keep them from doing that. Finally, the judge says, no, you've got to let them do it. I don't understand that. There's something wrong in that process there that doesn't make sense to me. Your Honor, if I see that I'm over time, but if I may just address some of those facts quickly, I would appreciate the opportunity to do that. You know, I think, first of all, the records were in disarray from the start. And that's what the independent audit that the town received showed. And so I'm not talking here about the state auditor's office. I'm not talking about Beth Wood and her office. I'm talking prior to that, there was an auditing agency. Every municipality in North Carolina has to have an independent annual audit. And so there was a company, Petway and Mills, that did the audit for the town. And what that audit found was that the records were in total disarray. So the records from the town were in disarray. So when it was taken over, you're saying it's the same disarray going on. But if you're going to make allegations of it, it sounds like someone has to go through those disarrayed records before you levy a complaint and indictment against someone. If you've got a pile over here of records, it's one thing to say, you know, well, it's in disarray. It's another thing to say, you don't have any receipts. And you've got a pile of stuff here. And you haven't even looked at that pile. You just make an indictment. Your Honor, I think it's important to understand the different functions of the different agencies that were involved here. The local government commission took over the records because of the disarray. And I'm not saying you can answer these questions. I'm just saying when you look at the totality of the situation here and the functions, I know the functions of this agency. And I know the problems with Princeville in terms of finances. But I'm saying to be able to indict someone and says you have an agency that doesn't exist and you didn't give receipts. We're not going to look in that pile of stuff over there where the answer is we're just going to indict. Now, whether they properly advance this or not, there's definitely something wrong with that, isn't it? Your Honor, I believe that the local government commission and the defendants there were focused on the financial circumstances in the town. They did not request that and that the mayor be prosecuted or that an indictment. Yeah, they started out on something totally different. It was totally different. The mayor is actually the one who went first about something totally different on it and then it morphed into this. It boomeranged back on the mayor. Now, I understand there's some infighting and I can understand how that happened, but I'm only pointing out. I'm not saying it because we've gotten away from the legal issues here. The legal issues here really inform this outcome. But when you look at it, you brought up the facts. I'm saying these are some bad facts all around on both sides. But I will leave it at there and give it back to my good colleague, the chief here, to determine where we go from here. OK. And thank you all very much. We would ask that you uphold the district court's decision. Thank you. Thank you. I'd like to continue on with Judge Wynn's very astute and appropriate analysis about the large volume of documents. But I want to back up just briefly about what is to claim here. This is a 1983 claim. Basically, anyone acting under color of law who deprives America of a constitutional right must pay damages. The Constitution. That's the answer right there. That's right. What is that? Under the color of law? That's what we're trying to figure out. What is that law? The color of law. Well, first, we have the State Bureau of Investigation, Chapman, and we have the LGC who have the authority. You don't have much time. Please, please concentrate, focus on the constitutional deprivation. Yes. The constitutional deprivation of twofold. One, the seizure, taking her liberty away under the 14th Amendment. Under the Fourth Amendment, first, seizing her, requiring her to have to pay money, her property. And secondly, the liberty interest under the 14th Amendment. And we cited the case. Yes. Counsel, can I stop you there? Because for a long time, it was very unclear in the law whether in a case like this involving criminal proceedings, you could bring a due process, generalized liberty claim about what happens in the pretrial phase of the criminal proceedings. But then the Supreme Court very recently decided this case manual. And they said, we're going to clear this all up until the day you go to trial. It's all about the Fourth Amendment. When your trial starts, the 14th Amendment kicks in. But anything that happens in the course of a criminal proceeding pretrial, you've got one claim and it's a Fourth Amendment claim. So I don't understand how there can be a 14th Amendment claim in this case. And I will say relatedly, I didn't see the district court let you go forward on a 14th Amendment claim. The district court initially grants all the motions to dismiss as there's nothing here. Come back with an amended complaint, but don't include malicious prosecution. And so you guys came back with your complaint, which looks like it's a Fourth Amendment claim. Well, that is correct. But the 14th Amendment has a liberty interest separate and apart from the due process interest. And of course, we did assert in the criminal case that there was a Brady violation, but was beyond Brady. It was not just we didn't disclose, but this was willful, intentional concealment. Now, getting back to Judge Wynn's factual issue about the big, large boxes of documents. Here, the two files that we needed were not with that 35,000 to 50,000 pages. They were within arm's reach in the LGC's office, in Defendant Edmondson's office. She indeed used those files to craft with Chapman the factual expenditures for the indictment. So this these files were volunteered by Edmondson in the third day of this inspection ordered by Jess Smith. Why? Because she knew those were the two files that we wanted. She had faxed receipts from those files back in September of 2012. So we knew that she had the files and we knew she had the Economic Development Committee file. And she knew that if she had not given us those two files that were in her office, where she and Chapman and Hammond and Holliman, where they all met over 20 times, that we would go back to Judge Smith and have her held in contempt. So she said, oh, yeah, here's some other files in my office. And those were the two files. Montagne picked up the file that said Economic Development Committee and said, oh, there goes my case. You all told me there was no Economic Development Committee. And then Hock and the other DA picked up the file with all the receipts on the reverse side of which was the business purpose. This was an innocent person in the beginning. They knew she was innocent. It was more than fair to disclose. This was active intentional concealment that took away her rights, her constitutional rights that everybody is entitled to. And this case should be reversed and let these issues of motive go to trial. We don't have to explain why they wanted to shut her up about this $26 million that to date has not been disclosed. We don't have to prove a motive, but a jury, a jury can conclude that it was because they did not want to deal with her constantly complaining about the missing $26 million, which today has not gone to that town. Thank you very much. We ask you to really do what Judge Smith did here, which shows that this was palpable injustice to Mayor Oates. And he ordered us to go to that office and look for those records. And that's why we're here today. And we hope that you also can feel the injustice to Mayor Oates and reverse this case. Let a jury decide the motive. Thank you very much. Thank you, counsel. Thank you all for your arguments. We appreciate them. I wish we could come down and greet you, but we can't under the circumstances. But nonetheless, we thank you for your arguments and we wish you well and be safe. And thank you. With that, counsel, I'm going to ask the clerk to adjourn the court. Thank you all very much for your attention and your indulgence. Thank you. This honorable court stands adjourned until this afternoon. God save the United States and this honorable court.
judges: Roger L. Gregory, James A. Wynn Jr., Pamela A. Harris